**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

FILED

Case No. 1:14-CV-156 (CMH) (JFA)

UNDER SEAL

*Plaintiffs,*

-against-

UNDER SEAL

*Defendants.*

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**FILED IN CAMERA & UNDER
SEAL (AS REQUIRED BY
31 U.S.C. § 3730(b)(2))**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| UNITED STATES OF AMERICA , *ex rel.*, RORY MAXWELL, JOHN BUSH, and SUPREME FOODSERVICE GMBH,<br><br>*Plaintiffs,*<br><br>-*against*-<br><br>ANHAM USA, INC., ANHAM FZCO a/k/a ANHAM LLC, UNITRANS INTERNATIONAL, INC., TRACKS LOGISTICS SERVICES LLC, ABDUL HUDA FAROUKI, MAZEN FAROUKI, DAVID BRAUS, SAAD AL ALAMI, KABIR ARGHANDIWAL, AND FADI NAHAS,<br><br>*Defendants.* | Case No. 1:14-CV-156 (CMH) (JFA)_____<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Rory Maxwell, John Bush, and Supreme Foodservice GmbH ("Supreme") bring this *qui tam* action as Relators on behalf of the United States of America against Defendants Anham USA, Inc., Anham FZCO a/k/a Anham LLC, Abdul Huda Farouki, David Braus, Fadi Nahas, Kabir Arghandiwal (collectively, "Anham"), Unitrans International, Inc., Tracks Logistics Services LLC, Mazen Farouki, and Saad Al Alami, under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and allege upon knowledge with respect to their own acts and those they personally witnessed, and upon information and belief with respect to all other matters, as follows:

## INTRODUCTION

1.      Beginning no later than December 2011, Defendants engaged in a fraudulent scheme involving false and fraudulent statements material to the United States government (the "United States" or the "Government") in order to procure two lucrative contracts, the

Afghanistan Subsistence Prime Vendor ("SPV") contract and the National Afghan Trucking ("NAT") contract.

2.     The SPV contract, valued by the Government at up to $8.1 billion, requires a full-line food distributor to supply and deliver food items to the military and other federally-funded customers at locations throughout Afghanistan.

3.     The NAT contract requires contractors to supply dry cargo transportation and freight forwarding services to U.S. military serving ISAF personnel assigned to Forward Operating Bases throughout Afghanistan.

4.     Defendants fraudulently induced the Government to award them the SPV and NAT contracts by failing, purposefully and intentionally, to report that they had shipped and were continuing to ship goods used to perform on the SPV and NAT contracts through Iran in violation of the Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560, and the International Emergency Economic Powers Act, 50 U.S.C. § 1705.[1]

5.     Throughout the first several months of 2012, Defendants shipped materials—mainly steel and insulation panels for use in constructing the SPV warehouse, and vehicles for use on the NAT contract—through Iran in knowing violation of U.S. trade sanctions.  All told, Defendants illegally transshipped through Iran at least 16 shipments of a total of 86 containers for use on the SPV contract and dozens of vehicles for use on the NAT contract.

6.     Defendants designed a circuitous route that shipped materials first into Iran, then into Turkmenistan, and then finally into Afghanistan—rather than shipping the materials directly

---

[1] The Sanctions were promulgated pursuant to, *inter alia*, 3 U.S.C. § 301; 18 U.S.C. §§ 2339B, 2332d; 22 U.S.C. § 2349aa–9; 22 U.S.C. § 7201–7211; 31 U.S.C. § 321(b); and 50 U.S.C. §§ 1601–1651, 1701–1706; as well as Executive Orders 12613, 12957, 12959, 13599, 13622, and 13628.

352018.2

from Iran into Afghanistan—which served to cloak the fact that Anham was transshipping through Iran in violation of the Iranian sanctions.

7.      Defendants did not inform the Government of the illegal transshipments—and indeed actively attempted to conceal such shipments. All Defendants had knowledge of these transshipments through Iran or were involved in the efforts to conceal these transshipments from the Defense Logistics Agency ("DLA") of the United States Department of Defense and the U.S. Army.

8.      Anham continued to conceal the transshipments from the Government when DLA was first informed of the Iranian transshipments in May 2013, by failing to disclose that it was dealing with Iran even after it was asked directly by the Director of DLA. Defendants did not disclose the transshipments until September 2013, after the Wall Street Journal contacted DLA regarding the fraud, and even then they continued to lie about the circumstances surrounding the shipments, claiming falsely that senior management had no knowledge of the shipments, that only a low level employee or subcontractor was involved, and that they made no effort to hide the shipments.

9.      Anham FZCO falsely certified in its SPV and NAT proposals that it was in compliance with relevant sanctions despite its duty to disclose such violations. Anham failed to disclose its lack of compliance with these sanctions when awarded each of the two contracts. Defendants' false certifications and continued omissions regarding this fraud were material to the Government because the United States would never have awarded two important military contracts to a contractor that was knowingly violating U.S. sanctions regimes.

3

10.     Defendant Anham FZCO fraudulently submitted an unknown number of invoices to the Government for payment on the SPV and NAT contracts that falsely, either expressly or by implication, state compliance with relevant sanctions.

11.     Defendants also fraudulently induced the Government to award them the SPV contract by making knowingly false and material misrepresentations regarding their construction of a warehouse complex at Bagram, Afghanistan, by which they misled the Government regarding their progress in establishing a distribution point for all of the food and water the Government was purchasing under the SPV contract for United States Department of Defense and other coalition personnel in Afghanistan.

12.     Defendants engaged in a scheme designed to defraud DLA by convincing the agency that Anham was on track to have an adequate warehouse to operate as the SPV in Afghanistan. Anham was required to have a warehouse meeting DLA requirements in order to be awarded the lucrative SPV contract. For the purpose of defrauding DLA, Anham and certain individual defendants constructed a Potemkin village of sham and useless columns and girders at the warehouse site, and ordered additional materials moved to the site to create the illusion of false progress on the warehouse. Anham photographed the staged scene with the sham girders and columns and the additional materials. The materials, including the girders and columns, were removed after the photographs were taken. The photographs—designed to mislead the Government into believing that construction of the warehouse had progressed further than it actually had—were sent to Anham FZCO in Dubai. Anham FZCO then forwarded them to Anham USA, which used the photographs in its submission to DLA, the entity charged with awarding and overseeing the SPV contract, in Philadelphia, Pennsylvania.

4

13.     Defendant Abdul Huda Farouki also gave the Defense Contract Management Agency ("DCMA") unrealistic timelines as to when the warehouse facilities would be completed.  Defendant Abdul Huda Farouki knew that these timelines could not be met. Specifically, he led a meeting with DCMA in Afghanistan where Anham FZCO knowingly and intentionally misrepresented that it could complete the warehouse 60 days after the SPV award was made.  The photographs, additional fraudulent paperwork, and subsequent deceptive statements by Anham officials were objective falsehoods by which Defendants both affirmatively misled and withheld information from the Government.  Thus, Defendants materially and fraudulently misrepresented the key facts regarding the construction of the warehouse for the purpose of fraudulently inducing DLA to award Anham the SPV contract for Afghanistan.

14.     DLA would not have awarded the SPV contract to Anham if DLA had been aware during the SPV negotiations that Anham was creating sham warehouse scenes and that the warehouse was substantially less complete than Anham led DLA to believe.  Defendant Anham FZCO has fraudulently submitted an unknown number of invoices to the Government for payment on the SPV contract that was awarded to the Defendants as a result of their sham warehouse scheme.

## PARTIES

15.     Relator Rory Maxwell joined the United Kingdom military in January 1981, after having graduated from the Royal Military Academy, Sandhurst.  He participated both in the liberation of Kuwait in 1991 and the invasion of Iraq in 2003, working alongside United States forces.  He was promoted to one-star general in November 2006.  In January 2010, he became the Head of Defense Logistics Operations and Plans in the United Kingdom Ministry of Defense.

5

He left the United Kingdom military on November 30, 2011, and immediately started employment as Anham's Country Manager in Afghanistan, based in Kabul. He held this position until January 2013. He thereafter worked in business development for Anham from Dubai until April 2013. He was employed by Supreme Foodservice GmbH from April 2013 until mid-January 2014.

16.     Relator John Bush spent several years in the United Kingdom military, rising to the rank of sergeant, before working in retail logistics. He joined Anham FZCO in April 2011 as the Senior Project Operations Manager for Kuwait and with the understanding that he would also be working on the proposal for the Afghanistan SPV contract. Relator Bush left Anham in August 2013.

17.     Relator Supreme Foodservice GmbH ("Supreme") is a corporation organized and existing under the laws of Switzerland, with its principal place of business at Zwinglistrasse 6, 8750 Glarus, Switzerland. Supreme was the Subsistence Prime Vendor in Afghanistan prior to Anham FZCO.

18.     Defendant Anham USA, Inc. ("Anham USA"), previously known as Nour USA, Limited, is a corporation organized and existing under the laws of Virginia, with its principal place of business at 1600 Tysons Blvd, 6th Floor, McLean, VA, 22102.

19.     Defendant Anham FZCO a/k/a Anham LLC ("Anham FZCO") is a limited liability company organized and existing under the laws of Dubai, U.A.E., with its principal place of business at Dubai Airport Free Zone, East Wing, Building 4A, Suite No. 608, P.O. Box 231082, Dubai, U.A.E.

6

20.    Defendant Unitrans International, Inc. ("Unitrans") is a corporation organized and existing under the laws of Virginia, with its principal place of business at 1900 Campus Commons Dr. Ste. 340, Reston, VA 20191.

21.    Defendant Tracks Logistics Services, LLC ("Tracks") is a limited liability company organized and existing under the laws of Jordan, with its principal place of business at 7th Circle– Issa Naouri St., Tala 1 Bldg, 2nd Floor, Amman, Jordan.

22.    Defendant Abdul Huda Farouki is a United States citizen who resides in Virginia.

23.    Defendant Mazen Farouki is a United States citizen who resides in Virginia.

24.    Defendant David Braus is a United States citizen who resides in Georgia.

25.    Defendant Saad Al Alami is a United States citizen who resides in Amman, Jordan.

26.    Defendant Kabir Arghandiwal is a United States citizen who resides in Dubai, U.A.E.

27.    Defendant Fadi Nahas is a United States citizen who resides in Virginia.

## JURISDICTION AND VENUE

28.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1345 (because the United Sates is a Plaintiff) and pursuant to 28 U.S.C. § 1331 (because the claims arise here under the False Claims Act, 31 U.S.C. § 3729, *et seq.*).

29.    Under 31 U.S.C. § 3730(e)(4)(A), there has been no statutorily relevant public disclosure of substantially the same "allegations or transactions" alleged in this complaint.  To the extent there has been any such public disclosure, Relators meet the definition of an original source, as that term is defined under 31 U.S.C. § 3730(e)(4)(B).

7

30.     This Court has personal jurisdiction over Defendants because they reside herein or have transacted business in the state and because they have purposefully availed themselves of the laws of the United States and of the Commonwealth of Virginia.

31.     Venue in this District is proper under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(2) (because this is the District in which a substantial part of the events or omissions giving rise to the claims in this case occurred) or under § 1391(b)(3) (because Defendants are subject to jurisdiction in this District).

## THE FACTS

### A.     Anham's Corporate and Affiliate Structure

32.     Defendant Anham FZCO is owned by the principals of the Arab Supply and Trading Company ("ASTRA") of Saudi Arabia; GMS Holdings of Amman, Jordan; and HII-Finance Corporation ("HII Finance") of Vienna, Virginia, USA.

33.     Anham FZCO has a number of affiliated companies, including Unitrans and Anham USA.

34.     HII Finance owns 100% of Unitrans and 25% of Anham FZCO.

35.     Defendant Anham USA is the management company through which Anham FZCO does business. Anham USA provides management services to Anham FZCO and manages Anham FZCO's worldwide logistics and construction supply chain as Anham FZCO's agent.

36.     Defendant Abdul Huda Farouki was, during the relevant time period, the Chairman of the Board and Chief Executive Officer of Anham FZCO and Anham USA. He was also on Anham FZCO's executive committee. He was replaced as Chief Executive Officer of

8

Anham FZCO in December 2013, but remained the Chairman and on its executive committee thereafter. Abdul Huda Farouki was, during the relevant time period, the Chairman of Unitrans. Further, his family group owns 100% of Unitrans through HII Finance. During the relevant time period, he was a director of HII Finance.

37.    Defendant David Braus was, during the relevant time period, the Managing Director of Anham FZCO and Anham USA and the Managing Director of HII Finance.

38.    Defendant Fadi Nahas was, during the relevant time period, the Senior Vice-President of Operations of Anham FZCO.

39.    During the relevant time period, Defendant Kabir Arghandiwal was Anham FZCO's Regional Vice President of Business Development Afghanistan/Central Asia. Defendant Arghandiwal is also a shareholder of Afghan Fleet and Group Services ("AFGS"). AFGS is a company associated with Anham and located in Afghanistan. AFGS's services included operations and maintenance, procurement, transportation, logistics, ICT and life support services. AFGS represents that it is fully compliant with all local laws and U.S. Government contracting and acquisition regulations.

40.    Defendant Unitrans was, during the relevant time period, owned by HII Finance. Unitrans claims it is a full-service international shipping and logistics company.

41.    Defendant Tracks was, during the relevant time period, owned jointly by Anham FZCO and Unitrans. Tracks claims to specialize in managing project logistics in remote and challenging regions and coordinates international cargo supply chains.

42.    Defendant Mazen Farouki, Abdul Farouki's brother, was, during the relevant time period, the Chief Executive Officer of Unitrans. Mazen Farouki was also, during the relevant time period, an officer or director of Tracks.

9

43.     Defendant Saad Al Alami is the nephew of Mazen and Abdul Huda Farouki and, upon information and belief, was, during the relevant time period, the Chief Executive Officer of Tracks.

**B.      In 2011, Anham Was an Experienced U.S. Government Contractor**

44.     As an experienced U.S. Government Contractor, Anham FZCO was fully aware of the prohibition against transshipping through Iran when it was negotiating the Afghanistan SPV Contract with DLA.  By 2011, Anham FZCO had already performed under another SPV contract in the Middle East as well as on a number of other government contracts in Afghanistan. As a contractor with the U.S. Government under these various contract, Anham FZCO knew it had to comply with the Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560 (the "Iran Sanctions").

**1.      Anham Was the Subsistence Prime Vendor For Iraq, Kuwait, and Jordan**

45.     Anham FZCO was awarded the SPV contract for Iraq, Kuwait, and Jordan in 2010.  As discussed below, an SPV is responsible for the supply and delivery of food items to the military and other federally-funded customers throughout the area covered by the contract.

46.     According to the Department of Defense, the estimated value of this contract to Anham was between $2.16 and $6.47 billion.

47.     The SPV contract for Iraq, Kuwait, and Jordan required that Anham certify that it was in compliance with all applicable United States laws and federal and Department of Defense regulations.

48.     David Braus signed this SPV contract on behalf of Anham FZCO.

10

49.     Anham USA is listed on this SPV contract as an "Administrative/Management Support/Headquarter" Office.

### 2.     Anham Had Additional U.S. Government Contracts in Afghanistan

50.     Anham FZCO was also awarded a number of contracts with the U.S. Government to perform services within Afghanistan.

51.     First, Anham FZCO contracted to supply 330 armored SUVs and light trucks for use by American military, embassy and related staff in and around Kabul (the "FAV Contract" for Fully Armored Vehicles). The FAV contract, contract number W91B4M-09-D-4001, was awarded by the Army to Anham FZCO in 2008 or 2009. The contract began in September 2009 and was extended through 2013. According to the Department of Defense, the estimated value of this contract to Anham FZCO was approximately $90 million.

52.     Anham FZCO also contracted to provide procurement, equipment, delivery, operations and maintenance services for a wide variety of Material Handling Equipment. This equipment includes cranes, dozers, forklifts, heavy duty trucks and other items for both of the two Logistics Civil Augmentation Program IV Prime Contractors in Afghanistan. According to the Government, the estimated value of this contract was approximately $90 million. Anham FZCO performed these services under subcontracts with DynCorp International LLC and Fluor. The contract with DynCorp International LLC was awarded in March 2011 and ended in approximately Summer 2013.

53.     Anham FZCO was awarded a contract to install, and completed installation of, an information mining system (MEMEX) and CCTV, in Kabul. This contract, contract number W91B4M-11-C-0014, was awarded on April 4, 2011 and ended in the latter part of 2012. These

11

systems were paid for by the United States and were designed for use by the Afghan security forces. The estimated value of this contract was approximately $2 million.

54.     USAID contracted Anham FZCO to perform the rehabilitation of the Darunta Hydroelectric Power Plant in Jalalabad, Nangarhar Province. Anham FZCO was refurbishing three turbines. This contract ran from August 2008 to October 2011. According to Anham FZCO, the estimated value of this contract was approximately $10 million.

55.     The U.S. Army contracted with Anham FZCO to supply dry cargo transportation and freight forwarding services under the Host Nation Trucking contract, which was the predecessor to the NAT contract (discussed below).

### 3.     Anham Was Well-Versed in the Prohibitions Against Shipping Through Iran

56.     By 2011, Anham FZCO was an experienced U.S. Government contractor. It was fully aware that such contractors are prohibiting from shipping through or otherwise doing business in Iran, not in the least because it had certified numerous times that it would comply with all U.S. law and regulations, including the Iran Sanctions.

57.     The Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560, specifically prohibit transshipment of goods through Iran. Such shipments also violate, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, the Iran Sanctions Act, 50 U.S.C. §§ 1701, *et seq.* and Executive Order No. 13059, 62 F.R. 44531 (August 19, 1997). Violations of the Iranian Transactions and Sanctions Regulations subject the violator to civil and criminal penalties. 50 U.S.C. § 1705.

58.     The Iranian Transactions and Sanctions Regulations apply to any United States citizen, resident alien, or entity organized under United States law, including all agencies of the

12

Government and Government contractors and subcontractors. 48 C.F.R. § 25.700 *et seq.*

("[A]gencies and their contractors and subcontractors must not acquire any supplies or services if any proclamation, Executive order, or statute administered by OFAC, or if OFAC's implementing regulations at 31 CFR Chapter V, would prohibit such a transaction by a person subject to the jurisdiction of the United States . . . [and] most transactions involving Cuba, Iran, and Sudan are prohibited"); 31 C.F.R. § 560.314.

59.     All of the Defendants are subject to and must abide by the Iran Sanctions.

60.     31 C.F.R. § 560.204, titled "Prohibited exportation, reexportation, sale, or supply of goods, technology, or services to Iran," provides:

> Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or (b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

61.     31 C.F.R. § 560.206, titled "Prohibited trade-related transactions with Iran; goods, technology, or services," provides, "[e]xcept as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, no United States person, wherever located, may engage in any transaction or dealing in or related to: (1) Goods or services of Iranian origin or owned or controlled by the Government of Iran."

13

62.     31 C.F.R. § 560.208, titled "Prohibited facilitation by United States persons of transactions by foreign persons," provides:

> Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, no United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States.

63.     The Treasury Department stated in Guidance on Transshipments Through Iran and Related Issues, March 26, 2010, that goods transshipped through Iran enter into Iranian commerce and become "goods of Iranian origin," pursuant to 31 C.F.R. § 560.306(a)(2).

64.     31 C.F.R. §560.403, titled "Transshipment or transit through Iran," provides that "[t]he prohibitions in §§560.204, 560.206, and 560.208 apply to export, reexport or supply transactions which require a transshipment or transit of goods or technology through Iran to third countries."

C.     **Anham Sought Two Lucrative Awards on the Solicitations That the U.S. Government Issued in 2011—the National Afghan Trucking Contract and the Subsistence Prime Vendor Contract**

1.     **On February 22, 2011, the Army Issued the NAT Solicitation**

65.     DLA issued the solicitation for the NAT contract under solicitation number W91B4N-11-R-5000 on February 22, 2011.

66.     The NAT contract requires contractors to supply dry cargo transportation and freight forwarding services on an "indefinite delivery/indefinite quantity" basis to U.S. military

14

serving Forward Operating Bases throughout Afghanistan. Unlike a traditional government services contract, the NAT contract created an opportunity for the government to lease vehicles for specific projects from a number of NAT contractors.

67.     The NAT solicitation required that each offeror certify that "the offeror, or any person owned or controlled by the offeror, does not engage in any activities for which sanctions may be imposed under section 5 of the Iran Sanctions Act of 1996."

## 2.     On April 26, 2011, DLA Issued the Afghan SPV Solicitation

68.     A few months later, on or about April 26, 2011, DLA also issued a solicitation for a full-line food distributor to act as the prime contractor responsible for the supply and delivery of food items to the military and other federally-funded customers at more than 200 locations throughout Afghanistan. This solicitation was later modified by DLA 12 times.

69.     As noted above, this type of contractor is known as a Subsistence Prime Vendor, or SPV.

70.     DLA-Troop Support provides the Army, Navy, Air Force, Marine Corps, other federal agencies, and allied forces with the full spectrum of logistics, acquisition and technical services. DLA sources and provides nearly 100 percent of the consumable items America's military forces need to operate. This includes food, fuel, energy, uniforms, medical supplies, and construction/barrier equipment. DLA-Troop Support solicits bids for SPV contracts, makes the awards, and oversees the contracts.

71.     The solicitation for the Afghan SPV contract contemplated the award of a single indefinite-delivery/indefinite-quantity fixed-price contract, with economic price adjustment, for a term of 66 months.

15

72.     The SPV solicitation contains an explicit notice to DLA suppliers that "each offeror must certify that the offeror, and any person owned or controlled by the offeror, does not engage in any activity for which sanctions may be imposed under section 5 of the Iran Sanctions Act." This requirement is repeated again later in the solicitation.

### 3.     Anham's Submitted Bid Proposals on Both of these Contracts in 2011

73.     Anham submitted its initial bid for the SPV contracts in July 2011. Anham submitted its initial bid on the NAT contract no later than July 29, 2011.

### a.     Anham Submitted its Bid on the NAT Contract

74.     In order both to obtain and perform on the NAT contract, a contractor must have a dedicated fleet of trucks, including what are referred to as "lowboy" trailers, to transport military cargo from Bagram Air Base and other locations. But at the time Anham FZCO submitted its initial bid on the NAT contract, it only owned five trailers in Afghanistan and did not have access to a sufficient number of compatible heavy lifting vehicles. To corner the market on NAT projects requiring these then-scarce heavy lifting vehicles, Anham planned to ship 28 lowboy trailers and 25 trucks/tractors from Iraq/Kuwait to Afghanistan. These transport assets, which Anham had used to perform its SPV contract in Iraq, were surplus assets after the U.S. troop drawdown in Iraq. The shipment of these assets into Afghanistan for use in performing the NAT contract was handled by Anham's Prime Vendor team in Kuwait with the involvement of Simon Khayat, Amham FZCO's Director of Operations PV Iraq.

### b.     Anham FZCO Submitted its Initial Bid on the SPV Contract on June 13, 2011

75.    Anham submitted a proposal for the Afghan SPV Contract on or about July 13, 2011 (the "Proposal"). The individual Defendants caused the Proposal to be submitted to DLA.

76.    Anham was competing against Supreme for the SPV contract, and in an effort to secure the SPV, Anham aggressively bid $1.4 billion less than Supreme for the contract.

### (1) Individual Defendants Were Involved in Every Aspect of Preparing Anham's FZCO's Initial Bid on the SPV Contract and Directed the Contents of the Proposal

77.    Relator John Bush worked for Anham FZCO on the Proposal to DLA from approximately April through May 2011, with a number of individuals, including Defendants Fadi Nahas and Saad Al Alami and non-Defendants Robert Zavala and Alaa Mattar. Laura Mahoney from Unitrans, and Kathleen Arbarquez, from Anham USA in Virginia, were very involved in writing the Proposal. Dave Schulte of Anham FZCO, an ex-colonel in the United States military, was also significantly involved in the writing process.

78.    After the several weeks in Dubai, Mr. Bush and this team travelled to Virginia to meet with Anham's main proposal writer, Greg Frock, (Anham's liaison with the Government on all contracts), Defendant David Braus and Anham's legal team. They spent about four weeks in Virginia working on the Proposal in June 2011.

79.    The proposal team worked out of the Defendant Unitrans's office, but they traveled to Anham's offices daily.

80.    Defendant Abdul Huda Farouki was often present at the meetings concerning the Proposal. Abdul Huda Farouki met with his brother, Defendant Mazen Farouki, regarding the Proposal, on several occasions.

352018.2

81.     Any item that had to be included in the Proposal was submitted to Defendant Fadi

Nahas.  This was so that only one person on the team communicated with the main writer, Mr.

Frock.

### (2) Anham FZCO Initially Represented that It Would Have an Operational Warehouse in Bagram, a Material Requirement of the Afghan SPV Contract, By December 2011

82.     The Afghan SPV contract was to be awarded to the bidder whose proposal was

determined to be the most advantageous to the Government, considering price and the technical

factors, subfactors, and elements.  These factors, subfactors, and elements included past

performance, warehouse location, and warehouse procedures.

83.     Without an operational warehouse or warehouses, a contractor would not be able

to perform under the SPV contract.  Anham did not have warehouses in Afghanistan at the time

the SPV solicitation was issued, so it proposed building two, one in Bagram and one in

Kandahar.  The warehouse in Bagram actually refers to two conjoined buildings.  Each building

is 100 meters wide and 150 meters deep, with chilled and frozen areas (collectively, the

"Warehouse").  The Warehouse had to be built precisely so that equipment could go though and

retrieve the necessary supplies.

84.     In order to secure the SPV Contract, Defendant Anham had to demonstrate to

DLA that the Warehouse would be completed in time to perform the SPV Contract.  Indeed, one

of the review criteria for the award of the SPV Contract was "Warehouse Location/Capacity."

85.     Anham knew that a bidder discovered making material false statements to the

DLA about such an important requirement under the Afghan SPV contract it would be

disqualified from consideration.

18

### (3) **Anham FZCO Certified that It Would Comply with the Iran Sanctions in Its Initial SPV Bid Proposal**

86.     In the proposal, Anham FZCO made various certifications, representations and warranties—including that it would "comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance" under the SPV Contract. These included the prohibition on transshipping goods through Iran and making payments to firms that are owned or controlled by the government of a country designated as a terrorist country by the Secretary of State of the United States. The Secretary of State designated Iran as such a country in 1984, pursuant to 22 U.S.C. § 2656f.

87.     In particular, the proposal stated, at page 8, that "ANHAM recognizes the importance of strict compliance with U.S. and local government regulations, and the need to embed such compliance into the operational culture of a project by utilizing 'tried and tested' systems."

88.     The proposal further identified Defendant Fadi Nahas as the Program Director, who, "in consultation with the U.S. Customer Representatives and ANHAM corporate leadership, has the authority to change processes and procedures to meet U.S. Laws, Government regulations, and project requirements."

89.     In addition to the representations in the proposal, the "Contractor Code of Business Ethics and Conduct," 48 C.F.R. § 52.203–13(b)(3)(i), requires a contractor to:

> timely disclose, in writing, to the agency Office of the Inspector General (OIG), with a copy to the Contracting Officer, whenever, in connection with the award, performance, or closeout of this contract or any subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed—
>
> (A) A violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or

(B) A violation of the civil False Claims Act (31 U.S.C. 3729–3733).

90.     Anham knew that DLA would not consider a SPV bid proposal from a contractor who knowingly violated the Iran Sanctions.

### D.     In 2011 and Early 2012, While It was Negotiating the NAT and SPV Contracts, Anham Made Material False Representations to DLA and Knowingly Violated the Iran Sanctions

91.     In 2011 and early 2012, Anham was negotiating with the Army and DLA to secure the NAT and SPV contracts, respectively. In the middle of this process, in December 2011, Gen. Maxwell began working at Anham. His primary responsibility as Country Manager for Afghanistan was to facilitate the bid for the SPV contract. He spent approximately 70% of his time on bid related matters, including on the construction of facilities required for the award and performance of the SPV Contract.

92.     Simultaneously with the solicitation negotiations, Anham was also coordinating the construction of the Warehouse, for the SPV contract, and the transportation of vehicles from Kuwait and Iraq to Afghanistan for use on the NAT contract.

93.     The construction of the Bagram warehouse was significantly behind schedule. In December 2011, the Warehouse was nothing more than a muddy field with a small number of footings. In order to begin the construction in earnest, Anham needed to obtain steel suitable to build the frame of the buildings. Anham planned to source the steel for the Warehouse construction from a Saudi Arabian company called International Building System Factory Co. ("IBSF"). IBSF is part of the ASTRA group which partially owns Defendants Anham FZCO.

94.     In its SPV proposal, Anham assumed two options for the transport of the materials needed to build facilities required to perform under the SPV Contract. The first was a

20

route through Pakistan. The second was a route through various Central Asian republics and into Afghanistan from the north. The northern route, known as the Northern Distribution Route, was much longer and twice as expensive as the route through Pakistan.

### 1. Anham Decided to Ship Materials, Machines and Vehicles for the Afghan SPV and NAT Contracts Through Iran

95. Anham FZCO felt intense pressure to get construction materials and vehicles into Afghanistan.

96. Anham FZCO originally planned on shipping the Warehouse steel and the vehicles for the NAT contract through Pakistan. Defendants Unitrans and Tracks were to handle the logistics of actually making the shipments, but individuals from Anham FZCO would be intimately involved in the shipping process at all times

97. Then, in late November 2011, Pakistan closed its border with Afghanistan in retaliation against the International Security Assistance Forces ("ISAF") following an ISAF airstrike on a Pakistani military outpost that killed several Pakistani soldiers.

98. The closing of the Pakistani border was a blow to Anham's ability to show DLA it was making progress on the Warehouse, a critical component of its SPV bid, during the very time period during which DLA was considering the Proposal. At the same time, it made it more difficult for Anham to get vehicles for the NAT contract in-country so that it could corner the market on projects requiring the use of lowboys, which at the time were scarce in Afghanistan.

99. Anham FZCO was also having cash-flow problems during this time period. It was having trouble obtaining financing and at times could not pay its subcontractors. This further delayed the construction of the Warehouse. As a result, Anham FZCO leadership was loathe to send the shipments through the longer and more costly Northern Distribution Route.

21

100. Thus, in late December 2011, Defendants Anham, Unitrans, and Tracks, as well as individual defendants, decided to use a shipment route through Iran in knowing violation of the Iran sanctions because it would be significantly faster and less expensive than the Northern Distribution Route.

101. Defendants decided to conceal their violation of U.S. law by shipping these materials in the name of AFGS rather than Anham. Defendants also deliberately avoided referencing Iran in its emails with other parties, and instructed subcontractors to avoid using the country's names in emails as well.

102. Defendants decided to ship the materials to the Iranian port of Bandar Abbas and then from there to Islam Qala, on the Iran-Afghanistan border.

103. Individuals involved in making this decision in December 2011 included Defendants Saad Al Alami and Fadi Nahas.

104. Defendants the Farouki brothers and David Braus were also involved in the decision to transship goods through Iran. Abdul Huda Farouki, either made the decision to transship goods through Iran or ratified it.

105. Defendant Kabir Arghandiwal knew that Anham was going to ship through Iran by December 29, 2011, at the latest.

106. The first transshipment began sailing in December 2011. All told, at least 16 shipments, containing at least 86 containers of steel and insulating panels, and forklifts, pallet jacks, and chargers for use in the SPV warehouse, were shipped to Bandar Abbas and then through Iran. Anham also shipped at least 25 5X4 truckheads, 28 lowbed 70Ts, and 3 lowbed 80Ts, through Iran for use on the NAT contract.

22

107.    Shortly after the Iranian transshipments began, on February 7, 2012, the Army awarded an NAT contract to Anham.

108.    Although the initial plan was for the containers to go from Bandar Abbas to Islam Qala and then to cross into Afghanistan, Defendants modified their plan on or about February 12, 2012. Later, the steel shipments were re-routed from Islam Qala to Sarakhs, on the border between Iran and Turkmenistan. From there, the cargo was transported to Aqina, Turkmenistan, and from there to Bagram.

109.    The decision to change the route so that the cargo appeared to be coming though Aqina was made during a conference call on approximately February 12, 2012. Defendants Fadi Nahas and Saad Al Alami were on the call.

110.    All of the Defendants participated in the decision to re-route the shipments to Sarakhs, and then into Afghanistan through Turkmenistan, rather than directly from Iran.

111.    Defendants did not inform the DLA contracting officer (as it was required to do under the Award and the Contractor Code of Business Ethics and Conduct) that it was transshipping the steel and insulation panels through Iran. These transshipments occurred before the SPV Contract was awarded and both before and after the award of the NAT contract.

112.    AFGS was responsible for receiving all the transshipments at the Afghanistan border for the final leg of the route to Bagram.

113.    Tidewater Middle East Co. ("Tidewater"), an Iranian company which was sanctioned by the U.S. Treasury Department in June 2011, runs at least part of the Bandar Abbas seaport (used for the Anham transshipments). Tidewater is owned by Iran's Islamic Revolutionary Guard Corps. Americans are prohibited from doing business with Tidewater, which both the United States and the European Union have sanctioned for engaging in

23

international terrorism. In order to use the Bandar Abbas seaport, Defendants had to engage in business with Tidewater.

### 2.     <u>Anham Fakes its Progress on the Warehouse</u>

114.     By late 2011, the construction of the Warehouse was significantly behind schedule. In early February 2012, Mughith Sukhtian, (a Jordanian citizen who is one of the founders of Anham FZCO, a Managing Director, and a member of its Board of Directors), and Defendant Fadi Nahas, then Anham's Senior Vice-President of Operations, came to Afghanistan. They had meetings with Gen. Maxwell, John Bush, and others, in Kabul and went to the Warehouse site. Mr. Sukhtian's presence at these meetings underscored the importance of the Warehouse to Anham's bid because he rarely came to Afghanistan. Mahmud Saleem, Anham's Chief Engineer for the project, Ron Kublawi, the finance director for the project, and Antoine Berberi, Anham's Director of Administration, were all present at these meetings. Upon information and belief, David Schulte and Akbar Arghandiwal, the CEO of AFGS, were also present at the meetings. In a meeting in Kabul, Mr. Sukhtian told Gen. Maxwell and his staff that they had to create the impression that Anham had made further progress on the Warehouse than had actually occurred. This deception was essential to Anham's bid for the Afghanistan SPV Contract because Anham had to submit a progress report to DLA in connection with its bid.

115.     Also in early February 2012, Gen. Maxwell had a separate call with Mr. Sukhtian concerning the Warehouse.

116.     During the above meetings and the February 2012 call, Mr. Sukhtian specifically directed that false columns and girders be put up at the Warehouse site. He also requested that 30 shipping containers, numerous vehicles, and some modular office units be moved to the

24

Warehouse site and positioned to create the impression of significant construction activity. Anham then implemented this deception.

117. Messrs. Sukhtian, Kublawi and Defendant Nahas procured the steel and the financing necessary to create the false columns and girders, sourcing the steel from a local market in Kabul. The steel used for the false columns and girders was not properly erected and did not have the necessary weight-bearing specifications. The columns were not thick enough or tall enough to enable construction. Mr. Saleem oversaw the implementation of Mr. Sukhtian's directives.

118. After this Potemkin village was erected at the Warehouse site, Anham FZCO directed its employees to take photographs of the site as proof for DLA that the construction was in-progress. Dozens of photographs were taken, and some of them were submitted to DLA. As soon as the photographs were taken, Anham FZCO directed that all the columns and girders be removed so that actual construction could begin.

119. These fraudulent photographs, as well as additional false paperwork concerning the warehouse, were sent to Anham FZCO in Dubai. Defendant Anham FZCO forwarded them to Anham USA, which sent them on to DLA in Philadelphia.

120. In May 2012, as part of pre-award due diligence, DCMA conducted an inspection of the warehouse. Defendant Abdul Huda Farouki, Defendant David Braus, Dave Schulte, Defendant Fadi Nahas, and Beau Lendman gave a briefing both in Kabul and at the warehouse. These individuals gave DCMA unrealistic timelines as to when the warehouse facilities would be completed. They did so knowing that these deadlines could not be met. Specifically, Anham knowingly and intentionally misrepresented that it could complete the warehouse 60 days after the SPV award was made. Anham would fail to meet this deadline after it was awarded the SPV

25

contract. Even after Supreme's protest of the SPV award ran its course in March 2013, Anham still did not have functioning warehouse facilities until the Fall of 2013.

121.     The photographs, additional false paperwork, and subsequent statements by Anham officials were objective falsehoods by which Defendants both affirmatively misled the Government and withheld information from the Government concerning noncompliance with a material contract term. Such objective falsehoods undoubtedly had a natural tendency to influence, or be capable of influencing the Government's decision to pay. Indeed, these falsehoods were critical to Anham's being awarded the SPV, as underscored by Anham's efforts to demonstrate "progress." If DLA had learned the truth about the status of the Warehouse and the fact that Anham would not be in a position to perform the SPV Contract in a timely fashion, it would not have awarded the contract to Anham.

### 3.     The Award of the SPV Contract to Anham

122.     On June 22, 2012, DLA-Troop Support in Philadelphia awarded the SPV Contract, Number SPM300-12-D-3571, to Defendant Anham. The SPV Contract guarantees that the Government will pay Anham a minimum of $100 million, but the Department of Defense has estimated the value of the Contract to be $8.1 billion, and it could be worth as much as $30 billion. Defendant David Braus signed the Afghanistan SPV Contract on behalf of Anham as Anham's Managing Director.

123.     In the SPV Contract, Anham represented that it would:

a.     "comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under" the SPV Contract;

b.     comply with Defense Federal Acquisition Regulation Supplement ("DFARS") 252.209-7004, which prohibits subcontracting with firms that are owned or controlled by the government of a terrorist country (like Iran) as designated in 22 U.S.C. § 2656f;

26

c.     exercise due diligence to ensure that none of the funds received under the SPV contract were provided, either directly or indirectly, to a person who is actively supporting an insurgency or otherwise actively opposing U.S. or coalition forces;

d.     comply with United States regulations, directives, instructions, policies, and procedures; and

e.     comply with Federal Acquisition Regulation ("FAR") 52.225-13, Restrictions on Certain Foreign Purchases (JUNE 2008), which provides:

> (a) Except as authorized by the Office of Foreign Assets Control (OFAC) in the Department of the Treasury, the Contractor shall not acquire, for use in the performance of this contract, any supplies or services if any proclamation, Executive order, or statute administered by OFAC, or if OFAC's implementing regulations at 31 CFR Chapter V, would prohibit such a transaction by a person subject to the jurisdiction of the United States.

> (b) Except as authorized by OFAC, most transactions involving Cuba, Iran, and Sudan are prohibited, as are most imports from Burma or North Korea, into the United States or its outlying areas.

124.     In particular, the SPV Contract, on page 53, in the section entitled 952.225-0004, "Compliance with Laws and Regulations," required Anham to "comply with, and...ensure that its employees and its subcontractors and their employees, at all tiers, are aware of and obey all U.S. and Host Nation laws, Federal or DoD Regulations, and US Central Command orders and directives ...."

125.     The SPV Contract further required Anham to "immediately notify...military law enforcement (Afghanistan) and the Contracting Officer if they suspect an employee has committed an offense."

126.     Compliance with the Iranian Transactions and Sanctions Regulations, which are included in 31 C.F.R. Chapter V, was a material term to DLA. This is evidenced , *inter alia*, by DLA's inclusion of a representation requiring such compliance in the SPV Contract, and DLA's making such compliance a condition of payment.

27

127.    All the individual Defendants were aware of the above terms of the SPV Contract and knew that the illegal transshipments through Iran were not permitted under the SPV Contract.

128.    In the spring and summer of 2012, including after the SPV Contract had been signed, Defendants also transshipped approximately 60 forklifts for use in the Warehouse through Iran. A few months later, in late summer/early autumn, the last of the lowboy trailers and trucks/tractors arrived in Afghanistan. These vehicles were scheduled to arrive in May 2012, but were apparently delayed because Iranian authorities would not clear the lowboy trailers and trucks/tractors, suspecting that they were going to be used by ISAF Forces fighting the Taliban. Defendant Anham ultimately convinced the Iranian authorities that the lowboy trailers and trucks/tractors were for commercial use in Afghanistan.

### 4.    Anham Continued to Make Material Misrepresentations to DLA and the Treasury Department About Its Shipments Through Iran Through 2013

129.    During the bid process and even after the SPV contract was awarded, Defendants made false representations concerning the status of the construction of the warehouse they needed to perform the SPV contract and the illegal transshipments through Iran.

130.    In fact, DLA did not begin to learn of Defendants' transshipments through Iran until May 2013, when Relator Supreme told Admiral Mark D. Harnitchek, DLA's then director, and Fred T. Pribble, DLA's then General Counsel, that Anham had done business with Iran in order to construct the warehouse. Supreme had learned of the transshipments through Relators Maxwell and Bush. The Relators caused the Department of Treasury, Office of Foreign Assets Control, to learn of Anham's fraud by Relators on July 5, 2013.

28

131.    After Relator Supreme informed DLA of the Iranian transshipments, Admiral Harnitchek asked Defendant Abdul Huda Farouki in May 2013 about the allegations and he "categorically denied [them]." Around this time, a representative of Anham FZCO also told Brigadier Stephen Shapiro that the company had no dealing with Iran and neither did their subcontractors.

132.    In September 2013, the Wall Street Journal contacted DLA to ask if the agency was "aware of allegations that Anham may have procured equipment for its Bagram warehouse and Afghan trucking contract through Iran." When questioned by Admiral Harnitchek in September 2013, Defendant Abdul Huda Farouki said that Anham had obtained a waiver of the sanctions. Admiral Harnitchek was unaware of any such waiver.

133.    Later Anham disclosed to DLA that it had transshipped through Iran, but claimed that Anham's leadership had only learned of the illegal shipments after its investigation in September 2013. Anham FZCO also claimed that the shipments were made by a subcontractor and minimized its involvement in the wrongdoing. Defendant Abdul Huda Farouki represented to Admiral Harnitchek that "top management would never have permitted [the Iran transshipments] had they known about it." Anham FZCO claimed that the decision to ship through Iran "was made by a lower level employee thinking there was no violation as sourcing country was Saudi Arabia." All of these representations were lies.

134.    Defendants Abdul Huda Farouki, David Braus, and Fadi Nahas all knew of and approved the decision to ship through Iran as of December 2011. Defendants Fadi Nahas, Mazen Farouki, and Saad Al Alaami were all copied on numerous emails tracking the shipments through Iran. In fact, Gen. Maxwell asked Defendant Fadi Nahas on or about the first week of

29

January 2012 whether the transshipments violated the Iran Sanctions, and Mr. Nahas responded that the decision was reviewed by management and was found not to violate the sanctions.

### E. Anham Submitted Invoices For Payment Under the SPV Contract That Are False And Fraudulent

135. DLA would not have awarded the SPV contract to Defendant Anham had Defendants advised DLA of the illegal transshipments through Iran, as they were required to do.

136. Anham's failures to abide by relevant sanctions concerning Iran, both with respect to warehouse materials and the NAT contract, made its multiple certifications in connection with the SPV contract that it would comply with such sanctions material misrepresentations by which Defendants both affirmatively misled and withheld information from the Government concerning noncompliance with a material contract term.

137. Anham acted to conceal the transshipments from the Government because it, and its leadership, including the individual Defendants, understood that the shipments were illegal. They understood the seriousness of the resulting sanctions violations, and knew that disclosure of their knowing violations of the sanctions would have adversely influenced the Government's decision to pay Anham.

138. Anham's compliance with the Iran sanctions—and its representations of such compliance—were material to the Government in its decisions to award the SPV Contract to Anham and to maintain Anham as the Vendor. The fact that Anham's compliance with the Iran sanctions was material to the United States is evidenced by multiple Government actions, including (a) DLA's demand for a certification from Anham in the SPV Contract that it would comply with all applicable federal laws (which include the Iran sanctions); (b) DLA's conditioning of payment on continued compliance with all applicable federal laws; (c) the

30

substantial activities of OFAC in administering and enforcing the Iran sanctions; (d) the Government's numerous enforcement actions enforcing compliance with the Iran sanctions; and (e) the Government's repeated determinations and pronouncements that compliance with the Iran sanctions is vital to the national security, foreign policy, and economy of the United States.

139. DLA would not have awarded the SPV contract to Defendant Anham had the agency known that the U.S. government contractor created a sham warehouse as part of a scheme to deliberately misrepresent its ability to perform on the SPV contract.

140. Anham's misrepresentations regarding the Warehouse progress were material to DLA, as evidenced by the fact that one of the review criteria for the SPV award was "Warehouse Location/Capability." Indeed, having an operational warehouse or warehouses was essential to a contractor's ability to perform on the SPV. Anham knew that it would be disqualified from the SPV bid process if DLA knew about its elaborate scheme to mislead the agency about its warehouse progress.

141. Anham submitted invoices for payment to DLA under the SPV Contract beginning no later than December 2013, and will continue to submit invoices as long as it is the SPV for Afghanistan.

142. Payment of these invoices is conditioned upon compliance with the Iranian Transactions and Sanctions Regulations.

143. Anham's fraudulent inducement of DLA to enter the SPV Contract through its Warehouse scheme and its failure to reveal to DLA the transshipments through Iran renders the invoices false and fraudulent.

144. The United States has paid these invoices.

31

**F.** **Anham Fraudulently Induced the Army To Enter Into the NAT Contract and Submitted False Claims**

145.    The U.S. Army would not have awarded the NAT contract to Anham had it known either that the lowboys and trucks/tractors were not already in Afghanistan or that they would be shipped to Afghanistan through Iran.

146.    Anham was obligated to disclose any violations of the Iranian Transactions and Sanctions Regulations to the Department of Defense.

147.    Further, upon information and belief, the NAT contract required Anham to ensure that its employees and subcontractors were aware of and obeyed all federal regulations and to report any violations of such regulations to, among others, the Contractor Officer.

148.    Compliance with the Iranian Transactions and Sanctions Regulations was a material term to the U.S. Army, as evidenced by the U.S. Army's inclusion of a representation requiring such compliance in the NAT contract.

149.    Compliance with the Iranian Transactions and Sanctions regulations was also a condition of payment under the NAT contract.

150.    Since approximately April 2012, Anham has submitted invoices to the U.S. Army for payment under the NAT contract, which the U.S. Army has paid.  Anham's fraudulent inducement of the U.S. Army to enter into the NAT Contract, its transshipment of lowboys and trucks/tractors through Iran, and its failure to reveal that it was not in compliance with the Iranian Transactions and Sanctions Regulations renders these invoices false and fraudulent.

**FIRST CLAIM FOR RELIEF**
(Violation of the Federal False Claims Act)

151.    Relators repeat and reallege the allegations set forth above as if fully set forth herein.

32

152.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

153.    As set forth above, in violation of 31 U.S.C. § 3729(a)(1)(A), Defendants knowingly presented, or caused to be presented, to the Government, false or fraudulent claims for payment or approval when it submitted invoices pursuant to the SPV Contract and the NAT contract. This is because they fraudulently caused DLA and the U.S. Army to enter into these contracts by omitting material facts and falsely affirming that they were in compliance with the terms of those contracts, including adherence to the Iranian Transactions and Sanctions Regulations.

154.    As set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B), Defendants also knowingly made, used, or caused to be made or used, false records or statements to obtain payment or approval by the Government of Anham's fraudulent claims for payment for performance of the SPV Contract and NAT contract.

155.    As set forth above, in violation of 31 U.S.C. § 3729(a)(1)(C), Defendants conspired to violate 31 U.S.C. §§ 3729(a)(1)(A) and (B) by, among other things, falsely representing that they had complied with the Iranian Transactions and Sanctions Regulations.

156.    To the extent that the facts alleged in this Complaint have been previously disclosed to the public or the Government in any fashion, Relators are an "original source" of the information as defined in 31 U.S.C. § 3730(e)(4).

157.    The Government and the public treasury have been damaged by and continue to be damaged by Defendants' fraudulent conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators request the following relief:

33

a.     That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

b.     That the Court enter judgment against Defendants in an amount equal to three times the damages suffered by the United States due to Defendants' unlawful conduct pursuant to 31 U.S.C. § 3729(a)(1)(G);

c.     That the Court enter judgment against Defendants assessing a civil penalty of no less than $5,500 and no more than $11,000 for each violation of 31 U.S.C. § 3729;

d.     That Relators receive the maximum award allowed by 31 U.S.C. § 3730(d);

e.     That Relators be awarded all costs of this action, including attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);

f.     That the Court award pre- and post-judgment interest on any damages awarded to the United States or Relators; and

g.     That the United States and Relators be awarded all such other relief that the Court deems just and proper.

Dated: New York, New York
      July 28, 2016

**CONSTANTINE CANNON LLP**

By: _____
Stephen Michael Kayan (Virginia Bar ID: 35204)
Robert L. Begleiter
One Franklin Square
1301 K Street, N.W., Suite 1050 East
Washington, DC 20005
Tel: 202.204.3500
Fax: 202.204.3501

352018.2

# CERTIFICATE OF SERVICE

I certify that on July 29, 2016, I caused to be delivered by email and overnight delivery copies of Realtor's Amended Complaint for Violations of the False Claims Act, to the following:

Art Coulter, Esq.
Commercial Litigation, Civil Division
U.S. Department of Justice
Patrick Henry Building Room 9902 PHB
601 D Street, N.W.
Washington, DC 20004

Richard Sponseller, Esq.
Assistant United States Attorney
Eastern District of Virginia
Justin W. Williams United States Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314


Patricia O'Keefe